FILED
08/16/2017
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2017

## STATE OF TENNESSEE v. KRISTIE LOUISE MCLERRAN

**Appeal from the Criminal Court for Clay County**
**No. 2011-CR-55     David A. Patterson, Judge**

_____

### No. M2016-02005-CCA-R3-CD

_____

The Defendant, Kristie Louise McLerran, entered a plea of nolo contendere to attempted aggravated child neglect, a Class B felony, as a Range I, standard offender and to serve an eight-year term with manner of service to be determined by the trial court.  At the sentencing hearing, the trial court imposed a term of incarceration, finding that confinement was necessary to avoid depreciating the seriousness of the offense.  The Defendant appeals the trial court's denial of alternative sentencing.  We conclude that the trial court did not err in sentencing the Defendant to a term of imprisonment.  Accordingly, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Michael R. Giaimo, Cookeville, Tennessee, for the appellant, Kristie Louise McLerran.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Mark Gore, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

Although the plea submission hearing transcript is not included in the record, we glean the following facts from the allegations contained in the indictments against the

Defendant and testimony provided at the sentencing hearing. Between January 1, 2011, and February 8, 2011, the Defendant and her husband, Mr. Timothy Curtis Bailey, neglected their two month old infant's health and welfare and caused serious bodily injury to the infant who is the victim. On October 29, 2013, a Clay County Grand Jury indicted the Defendant and Mr. Bailey on one count of aggravated child neglect and four counts of aggravated parental or custodial child endangerment. On May 23, 2016, the Defendant entered a plea of nolo contendere to attempted aggravated child neglect, a Class B felony. *See* T.C.A. §§ 39-12-107(a), 39-15-401(b) (2010), 39-15-402(a)(1), (b) (2010). Pursuant to the plea agreement, the Defendant was to receive an eight-year sentence as a Range I, standard offender, and a sentencing hearing was to be held to determine whether the Defendant would serve her sentence in confinement or on probation.

At the August 9, 2016 sentencing hearing, Tiffany Lawson, a probation officer, testified that she prepared the Defendant's pre-sentence investigation report, which was admitted into evidence. She also testified that the Defendant did not report to the scheduled in-person meeting to prepare the report but rather mailed her the information instead. Ms. Lawson read from the Defendant's statement. The Defendant wrote that she gave birth to the victim in December 2010, that the victim was premature, and that she breastfed the victim. The Defendant stated that her "milk was 16.2 when it's supposed to be 22.1" and that "[t]he doctors thought I starved him, but would never do that to my child or any child." Ms. Lawson stated that there were no mitigating factors to note in the pre-sentence investigation report. She also stated that the Defendant's prior criminal history included a criminal trespass conviction, which she served on probation, and some traffic citations. She testified that as of the time of the hearing, the Defendant had failed to submit a urine sample for drug screening. She also testified that the Defendant had completed a treatment program as required by the Department of Children's Services and, although unverified, was employed.

On cross-examination, Ms. Lawson testified that the Defendant had been released on bond for almost five years and that there was no indication that the Defendant had issues complying with the terms of her bond. Ms. Lawson also testified that the report contained a summary of the facts culled from the medical records regarding the child neglect. She stated that the victim was born around December 12, 2010, and that the Defendant and victim were released from the hospital on December 16. The Defendant had an appointment with Dr. Mark Langenberg on December 28 and a follow up visit to the health department two days later. The Defendant missed several scheduled doctor's visits before going to the doctor thirty-seven days after her last visit with Dr. Langenberg. Dr. Langenberg noted that the victim was malnourished and told the Defendant to have the victim admitted to the hospital, where Dr. Sandra Moutsios treated the victim. Ms. Lawson stated that the medical reports indicated that the child's "failure to thrive" was

due to a lack of nutrition and not attributable to any other reason. She also stated that Dr. Moutsios indicated concern over a positive drug screen result from the Defendant's breast milk. Defense counsel introduced a note from Dr. Ashley Toriac, a pediatrician from the hospital, that stated that the Defendant's positive drug screen was a false positive and that the breast milk was "normal." Ms. Lawson testified that the Defendant reported pumping breast milk for the victim and giving the victim supplemental milk. She also testified that the Defendant missed their first scheduled meeting for completing the sentencing report questionnaire because the Defendant's husband had been arrested and that the Defendant missed their second scheduled meeting because she overslept.

Dr. Sandra Moutsios, who was accepted by the trial court as an expert in pediatrics, testified that part of her role as a pediatrician is to identify child abuse victims and consult in their treatment. She testified that on February 8, 2010, the victim was admitted into the pediatric intensive care unit (PICU). On February 10, 2010, Dr. Moutsios met with the victim in her role as an abuse care consultant. She stated that upon arrival at the emergency room, the medical staff noticed that the victim was "severely underweight." She also stated that the victim had a glucose level of 27 and was admitted to the PICU for "profound malnutrition, failure to thrive, and life threatening hypoglycemia." Dr. Moutsios explained that a normal gluscose level is between 70 and 110 and that the victim's hypoglycemia "put him at a high risk for seizure and hypoglycemic coma," which can be life threatening. She also explained that failure to thrive is when an infant is unable to gain weight. She testified that upon the victim's admission to the emergency room, the victim weighed five pounds and one ounce, compared to his birth weight of five pounds and eleven ounces. She also testified that there was no other "organic cause for his failure to gain weight."

In response to questioning by the trial court, Dr. Moutsios explained that the victim "was born four weeks early and in the last month of a pregnancy is when a lot of the extra fat stores come on a baby." She read from the summary of her report that she drafted during her care for the victim, which stated, in part:

I'm concerned that the parents are simply not feeding this child enough for him to survive. Furthermore, that they have not recognized that he is extremely malnourished, which I believe is obvious to a layperson who looks at this child. … They've missed five appointments for medical care per their [primary care provider's (PCP)] recommendation, resulting in significant medical neglect.

Dr. Moutsios continued to read from her notes, which stated:

Infant was seen by his PCP a few days after birth and they were about to come back for a weight check. Mom states they were unable to keep [two] appointments that were scheduled due to snow days. They kept their routine scheduled [two] month appointment which is the visit the PCP sent them to Vanderbilt. At that visit, mom had no complaints or concerns about his growth. Dr. Moutsios spoke with the PCP [on February 10, 2010, at 5:00 p.m.] to get his perspective from any prior concerns. [Dr. Landenberg] states mom cancelled five [] appointments prior to their visit this past week. He states that in the interim mom would text him with questions. He recalls her saying, "His eyes rolled back in his head for one second, should I worry?" to which he replied if you're concerned[,] bring him in for me to see him[,] which she did not. At their visit on [February 8, 2011], they were instructed to come directly from his office to Vanderbilt. At the end of the workday, they had still not arrived at Vanderbilt. He was concerned enough to call the Celina Police Department to investigate their whereabouts. …

Dr. Moutsios testified that during her care for the victim, she was accompanied by a medical student, who was in her mid-twenties and did not have children. The student began to cry upon seeing the victim. She testified that in her report, she described the victim as having a "[d]isturbingly wasted appearance, emaciatingly thin, temporal wasting, no subcutaneous fat in his arms, legs, or buttocks."

On cross-examination, defense counsel read from Dr. Moutsios's report that said, "The positive drug screen on [the Defendant's] breast milk suggests that she is using multiple substances that may impair her judgment and impair her ability to parent appropriately. I am concerned that neither parent recognizes that [the victim] is emaciated and profoundly malnourished." Dr. Moutsios testified that she was concerned because the Defendant was not troubled by the victim's failure to gain weight. She admitted that it was possible that her opinion regarding the Defendant's judgment was influenced by the drug screen results. She also admitted that the drug screen was a false positive. She testified that after Dr. Langenberg told the Defendant to take the victim to the emergency room, the Defendant took the victim to the emergency room the same day but not immediately. Dr. Moutsios also testified that both the Defendant and the victim's father were cooperative and answered all of her questions. She stated that following the secondary newborn screen, she concluded that the victim's poor physical health was caused only by a deficit of calories. She also stated that the victim lived with the Defendant, his father, and three half-siblings.

Lieutenant Rick Lisi with the Clay County Sheriff's Office testified that at the time of the sentencing hearing, the Defendant had an outstanding warrant in Overton County, Tennessee.

Ms. Patricia Copas, the Defendant's aunt, testified that the Defendant has a general education diploma (GED) and was employed. Ms. Copas, however, could not recall where the Defendant worked. She stated that she believed that the Defendant had five children. She also stated that the Defendant gave birth to two children during the five-year period between the time of her release on bond and the sentencing hearing. Ms. Copas described the Defendant as "an excellent mom" to her two youngest children who were in the Defendant's custody. She said the Defendant was attentive to her children's needs and a hard worker. Ms. Copas testified that she did not know the Defendant to get into trouble often. She also testified that the Defendant's three oldest children were in the custody of their respective fathers and that the Defendant had visitation with them. She stated that while the victim was in the Defendant's care, the Defendant was "attentive" and breastfed the victim. Ms. Copas did not see the Defendant use formula to supplement the victim's diet. Ms. Copas testified that she never saw the Defendant abuse the victim or be inattentive to the victim. She was shocked when she learned that the Defendant had been indicted for neglecting the victim. She stated that after the Defendant was arrested and the victim was removed from her custody, the Defendant's world had been torn apart, stating that her children "were her life." She testified that the Defendant was doing a "pretty good job" of putting "her life back together." She also testified that the Defendant fed her two youngest children in the same manner as she fed the victim. She stated that the Defendant was poor and lacked the resources to secure regular access to transportation.

On cross-examination, the prosecutor showed Ms. Copas a photograph of the victim. Ms. Copas stated that the victim looked "critical" and "real premature." The prosecutor asked whether Ms. Copas noticed any fat on the victim's body, and Ms. Copas stated that she only saw fat around the victim's knees and rib cage. She also stated that while visiting the Defendant at the Defendant's house, she saw the Defendant feed the victim "when he was hungry." She testified that the Defendant lived within walking distance to the local hospital. She also testified that to her knowledge, the Defendant was not using drugs during her care of the victim.

In her allocution, the Defendant stated that she had her GED and attended almost one year of college to be a pharmacy technician. She also stated that she was twenty-four years old when she gave birth to her fourth child, the victim. She said that the victim was the first child that she gave birth to who was premature. She also said that she decided to breastfeed the victim because her other children "did really well" being breastfed. She admitted to missing doctor's appointments, explaining that she was not wealthy,

struggled, and worked every day. She stated that she has a three-year-old girl and a fifteen-month-old infant at home. She also stated that she does not have visitation with her older children. She concluded by stating, "I wouldn't hurt my child. I wouldn't hurt no child for that matter."

Following the conclusion of proof, the trial court noted that the Defendant had failed to submit to urinalysis for drug screening prior to the sentencing hearing. The trial court found that the Defendant's offense involved a victim that was particularly vulnerable due to his infancy, on which the trial court placed "great weight." T.C.A. § 40-35-114(4) (2011). The trial court also found that the "nature of the neglect" was concerning because the victim was "almost dead" and the Defendant failed to recognize the problem. The trial court noted that the picture of the victim was "disturbing." The trial court credited Dr. Moutsois' testimony where she characterized the victim as "profoundly" malnourished, which went unrecognized by the Defendant and caused Dr. Moutsois's intern to cry upon sight of the victim. The trial court found that the Defendant abused her position of private trust which significantly facilitated the commission of the offense. *Id.* § 40-35-114(14). The trial court remarked that the Defendant "did not want the child." The trial court found that there was no explanation for the victim's physical condition other than he was not fed. The trial court noted that it was "happy" that the Defendant was not in a position of trust for the victim or her three other children anymore.

The trial court voiced concern over the Defendant's "amenability of correction." The trial court stated that it believed that the Defendant did not report in person to her probation officer because she knew she would have to submit a urine sample for drug testing, which would come back positive. The trial court found that the Defendant's failure to submit to a drug screen was an indication that she was not amenable to correction and, thus, probation was inappropriate. The trial court noted that the State highlighted that this was an uncommon offense and that the charge in the indictment was a Class A felony. *Id.* § 39-15-402(b). The trial court found that confinement was "necessary to avoid depreciating the seriousness of the offense." *Id.* § 40-35-103(1)(B). The trial court agreed with defense counsel's argument that there was not a need to deny alternative sentencing on the basis of deterrence because "we don't have a lot of cases like this." The trial court concluded by stating that it considered "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4). Moreover, the trial court did not apply any mitigating factors. *Id.* § 40-35-113.

Following its findings, the trial court sentenced the Defendant to a term of incarceration to be served for eight years at thirty percent. The Defendant appeals.

**ANALYSIS**

On appeal, the Defendant challenges the trial court's denial of alternative sentencing. The Defendant contends that the trial court erred in its decision because (1) she does not have a long or serious criminal history; (2) she successfully completed a previous sentence on probation; (3) she complied with the terms of her bail for the instant charge; (4) the trial court failed to properly consider mitigating factors; (5) there was no evidence to suggest that she intentionally or knowingly neglected the victim; (6) she brought the victim to the hospital after being told to do so; (7) there was no evidence of neglect to any of her other five children, making neglect of the victim "somewhat inconceivable"; (8) she gave birth to two children while on bail prior to her guilty plea, and those children will not be able to be raised by their mother; and (9) her confinement will not act as a deterrence and will not act to prevent the depreciation of the seriousness of the offense. The State argues that the trial court did not abuse its discretion. We agree with the State.

A trial court's decision regarding the length and manner of service of a sentence is reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences reflecting a proper application of the purposes and principles of the Sentencing Act. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Under *Bise,* "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *Id.* at 706. A sentence within the appropriate range will be upheld so long as "there are other reasons consistent with the purposes and principles of sentencing." *Id.*

Tennessee Code Annotated section 40-35-104 authorizes alternative sentences, which may include a sentence of confinement that is suspended upon a term of probation or a sentence of continuous or periodic confinement in conjunction with a term of probation. T.C.A. § 40-35-104(c)(3), (4), (5). A defendant is eligible for probation if the sentence imposed is ten years or fewer. *Id.* § 40-35-303(a). Although "probation shall be automatically considered by the court as a sentencing alternative for eligible defendants," the defendant bears the burden of "establishing suitability" for probation. *Id.* § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). The Tennessee Supreme Court explicitly applied the abuse of discretion standard of review in *Bise* to alternative sentencing in *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) ("[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence.").

Tennessee Code Annotated section 40-35-103 requires that sentences involving confinement be based on the following considerations:

> (A) Confinement is necessary to protect society by restraining a Defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the Defendant[.]

T.C.A. § 40-35-103(1).

Here, the trial court based its determination that the Defendant should be confined upon finding that incarceration was "necessary to avoid depreciating the seriousness of the offense." *Id.* § 40-35-103(1)(B). If a trial court imposes a sentence of incarceration based on the seriousness of the offense, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006) (quoting *State v. Grissom*, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997). Moreover, a trial court may not consider factors that constitute elements of the offense in determining whether the circumstances of an offense satisfy this standard. *See Housewright*, 982 S.W.2d at 358 (citing *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 10 (Tenn. 2000)).

The trial court characterized the victim's appearance caused by the Defendant's neglect as "disturbing." The trial court found that the Defendant's neglect left the victim "almost dead." The trial court highlighted Dr. Moutsios's testimony where she described how her intern cried upon seeing the victim in his "profoundly malnourished" state. We hold that the trial court made appropriate findings to support the conclusion that the "circumstances of the offense" were "'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree.'" *Trotter*, 201 S.W.3d at 654 (quoting *Grissom*, 956 S.W.2d at 520).

Moreover, "enhancement and mitigating factors are relevant to the trial court's determination of the manner in which a felony sentence is to be served." *See State v. Souder,* 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002) (citing *State v. Bolling*, 75

S.W.3d 418, 421 (Tenn. Crim. App. 2001)). When determining whether probation is appropriate it is proper "to look behind the plea bargain and consider the true nature of the offenses committed." *State v. Pierce*, 138 S.W.3d 820, 828 (Tenn. 2004) (quoting *Hollingsworth*, 647 S.W.2d at 939). A trial court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. T.C.A. § 40-35-103(5); *State v. Boston*, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

Here, the trial court placed significant weight in its finding that the Defendant's sentence should be enhanced because the victim "was particularly vulnerable" due to his infancy. *Id.* § 40-35-114(4). The trial court also enhanced the Defendant's sentence because she abused her position of private trust with the victim "in a manner that significantly facilitated the commission or the fulfillment of the offense." *Id.* § 40-35-114(14). Moreover, although the trial court considered the mitigating factors that the Defendant brought to the court's attention, the trial court did not find that any mitigating factors applied.

Next, the trial court "look[ed] behind the plea bargain." *Pierce*, 138 S.W.3d at 820. The Defendant was charged with aggravated child neglect, which is a Class A felony and, thus, ineligible for alternative sentencing. The trial court found that aggravated child neglect is "a serious offense" and that "the good work of a very, very good attorney" allowed the Defendant to plead guilty to a lower felony classification.

Third, the trial court found that the Defendant was not amenable to rehabilitation. *See* T.C.A. § 40-35-103(5); *Boston*, 938 S.W.2d at 438. The trial court based its finding on the Defendant's refusal to report in person to her probation officer. Moreover, the trial court found that the Defendant did not wish to report in person because she knew she would be forced to submit to a drug screening, which would test positive for drugs.

Finally, the trial court specifically found that it was imposing "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *See* T.C.A. § 40-35-103(2), (4). Based on our review of the trial court's findings, we hold that none of them favored the Defendant's request for alternative sentencing. Accordingly, we hold that the trial court properly determined that "the nature of the offense," thus, "outweigh[ed] all factors favoring a sentence other than confinement." *Trotter*, 201 S.W.3d at 654. We conclude that the trial court did not abuse its discretion in denying the Defendant's request for an alternative sentence and imposing a sentence of confinement.

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JOHN EVERETT WILLIAMS, JUDGE